IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 18, 2025

**STATE OF TENNESSEE v. MICHAEL DUNFORD**

**Appeal from the Criminal Court for Knox County**
No. 116609     Hector I. Sanchez, Judge[1]

_____

**No. E2024-00574-CCA-R3-CD**

_____

Defendant, Michael Dunford, appeals as of right from his jury convictions for two counts of aggravated robbery and two counts of aggravated kidnapping, for which he received an effective sentence of fifteen years. On appeal, Defendant contends that the evidence was insufficient to prove his identity as the perpetrator and that the trial court erred by imposing a longer sentence than the minimum in-range sentence of twelve years. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and JILL BARTEE AYERS, JJ., joined.

Dillon E. Zinser (at motion for new trial and on appeal) and Julia Anna Trent (at trial and sentencing), Knoxville, Tennessee, for the appellant, Michael Dunford.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Deborah H. Malone and Willie Lane, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This case arises from the August 9, 2019 armed robbery of Tyler Raines, who was working at the front desk of a Motel 6 in the Cedar Bluff area of Knoxville. The November 2019 term of the Knox County Grand Jury returned an indictment charging Defendant with

---

[1] The Honorable Kyle A. Hixson presided over Defendant's trial and sentencing. After Judge Hixson was appointed to this court in September 2022, Judge Sanchez presided over the motion for new trial.

aggravated robbery by display of a deadly weapon, aggravated robbery accomplished with a deadly weapon placing the victim in fear, aggravated kidnapping by removal to facilitate the commission of a felony, and aggravated kidnapping by removal or confinement to facilitate flight from a felony, all Class B felonies. *See* Tenn. Code Ann. §§ 39-13-304, -402.

At trial, Mr. Raines testified that he first met Defendant at Defendant's parents' home when they were children; Mr. Raines was twenty-six years old at the time of trial. Mr. Raines noted that his mother previously worked at Motel 6 and that he and Defendant also worked at Motel 6 together for two or three months.

Mr. Raines testified that, on August 9, 2019, he was working the night shift at Motel 6, sitting in the lobby, and playing a video game. Mr. Raines stated that, although he locked the lobby door between midnight and 5:00 a.m., he did not realize that it was possible to slide the door open when it was locked. He stated that a person, whom he later realized was Defendant, entered the lobby and held a rifle to his head. Mr. Raines said that Defendant told him, "You can either get up or you can get shot" and that he was "here for the money." Mr. Raines noted that he was "not going to get shot over no $10 an hour" and that he felt nauseated and became pale because "it was kind of a scary, scary moment."

Mr. Raines testified that they walked to the register and that Defendant asked, "You know who I am?" Mr. Raines responded that he did not, and Defendant said, "I'm Michael . . . . Michael Dunford. I used to work with you." Mr. Raines asked Defendant what he was doing, and Defendant answered, "F Dan, F Dan, F this place." Defendant said that he "assumed" his wife was having an affair with Dan, who was the motel's owner.[2]

Mr. Raines testified that he opened the register and gave Defendant the money inside; Defendant stated that he also "want[ed] the f---ing safe." Mr. Raines asked if Defendant wanted the safe or the "drop box," and Defendant said, "I want it f---ing all." They walked to the back office to get the safe, which was heavier than Defendant could lift alone. Defendant took Mr. Raines to find a luggage trolly; after they returned, Defendant set down his rifle to help Mr. Raines lift the safe onto the trolly. When asked whether he felt free to leave, Mr. Raines responded, "Hell no."

Mr. Raines testified that they took the trolly and safe to an adjacent restaurant parking lot, where Defendant loaded the safe into his car. Mr. Raines stated that he looked at the license plate, went back to the motel lobby, and called 911.

---

[2] There was no testimony concerning Dan's last name.

The 911 call recording was received as an exhibit. In the recording, Mr. Raines reported having been robbed and stated that the perpetrator had an "assault rifle." Mr. Raines stated that the perpetrator was wearing blue jeans, a grey hooded sweatshirt, and a white mask over his face. Mr. Raines described the perpetrator as a black man three times during the call; Mr. Raines noted that he could see the man's forehead and that he could tell the perpetrator was black "from the way he was talk[ing]." Mr. Raines added that the perpetrator had brown eyes. Mr. Raines stated that the perpetrator was driving a tan Honda van with license plate number "3KO 1M6" and that the perpetrator was still in the parking lot. Mr. Raines stated that the perpetrator took all the money out of the safe. Mr. Raines testified that, after the 911 call, he still felt afraid.

When asked whether the man who robbed him was black, Mr. Raines responded, "I can't really tell you and verify that honestly. I just know he told me it was Michael is why I called in." Mr. Raines identified Defendant in the courtroom as the man who robbed him. Mr. Raines agreed that Defendant was not black. When the prosecutor noted Mr. Raines's description of the perpetrator as black in his 911 call, Mr. Raines stated that Defendant "had a face mask on, and it looked like maybe dirt or paint over his forehead or his eyes at the time."

Mr. Raines identified two photographs of a tan Honda Odessey van, which were received as an exhibit; the license plate number was "3KO 1M6." Mr. Raines affirmed that it was the same vehicle into which Defendant loaded the safe.

Six surveillance videos from Motel 6's cameras were received as an exhibit. None of them included audio. The first recording showed a long walkway bordering a parking lot. In the recording, two men were visible walking away from the camera; one, whom Mr. Raines identified as Defendant, wore a grey hooded sweatshirt with the hood raised, a long white bandana over his face, and loose blue jeans. After a moment out of view, the men walked back toward the camera. The man on the right, whom Mr. Raines identified as himself, was pushing an empty luggage cart. Defendant held a black rifle to Mr. Raines's torso as they walked. As the men walked past the camera, Defendant raised his middle finger and held it close to the camera.

The second and third recordings showed the motel building and a parking lot; Mr. Raines and Defendant were visible rolling the luggage cart through the parking lot to the back of a van parked at a distance from the camera.

The fourth recording showed the exterior front entrance to the motel. Defendant jogged toward the entrance carrying a black rifle in one hand and black backpack on the opposite shoulder; as he came into the lighted overhang, it was apparent that his hands and forehead were white in skin tone. Defendant opened the front door and went inside.

-3-

The fifth and sixth recordings showed the interior motel lobby from each back corner behind the front desk. Mr. Raines was sitting on a footstool on the side of the lobby opposite the front desk looking at the television. Defendant walked toward Mr. Raines with his rifle aimed at Mr. Raines's torso; Mr. Raines got up and walked behind the front desk and opened a drawer. Defendant's sweatshirt sleeves were pulled over his hands such that they were not visible while he held the rifle. Defendant placed his backpack on the counter and stood near the drawer. Mr. Raines placed what appeared to be cash into the backpack; Defendant then pushed Mr. Raines away from the front desk. Mr. Raines pointed in the other direction, and Defendant allowed him to walk in that direction while following him. Both men walked out of the camera frame for about fifty seconds, and then Mr. Raines walked back to the open drawer with his hands raised. Defendant followed; he carried his backpack in one hand and held the rifle toward Mr. Raines in the other. Mr. Raines picked up a small bag from inside the drawer and set it back down; Mr. Raines then closed the drawer and walked away from Defendant toward the camera before returning to him, and they both walked away out of the camera frame. Although Defendant's face was mostly obscured, his forehead and the bridge of his nose were briefly visible two times as he passed one of the cameras, and it was apparent that he was white.

Mr. Raines testified that he did not pay attention to the fact that Defendant had pulled his sleeves over his hands. He stated that the motel's office did not have a camera. Mr. Raines said that he held his hands up because Defendant "just told [him] not to be funny[.]" Mr. Raines noted that he wanted to give Defendant the money so that Defendant would leave. Mr. Raines testified that the gun intimidated him and that he did not want his son to grow up without him.

Mr. Raines testified that, when Defendant raised his middle finger toward the surveillance camera, he stated, "F--k Dan," five to eight times. He said that Defendant held the rifle at all times other than when they picked up the safe together. Mr. Raines said that he called 911 and his wife before calling his mother, who told him that he needed to wait for the police to avoid "go[ing] to jail . . . for leaving a crime scene."

On cross-examination, Mr. Raines testified that Defendant's mother was the head housekeeper at Motel 6 and that she had worked with Mr. Raines's mother at some point. Mr. Raines stated that Defendant's wife, Jenny Dunford, worked at Motel 6 in laundry and that he did not work directly with her. Mr. Raines did not know what kind of car Ms. Dunford drove. Mr. Raines acknowledged having told the 911 operator that a black man robbed him. Mr. Raines stated relative to the alleged affair between Dan and Ms. Dunford, "I'm not involved with that. I mean, that's what [Defendant] presumed to say or tell me." Mr. Raines testified that the safe and the money inside belonged to the motel and that none of his property was taken.

-4-

On redirect examination, Mr. Raines testified that he was responsible for the cash register and securing the safe. He denied giving Defendant permission to take the safe. He stated that the only reason he gave the safe to Defendant was the gun. When asked why he told the 911 operator that a black man had robbed him, Mr. Raines responded, "[I]t looked like he had painting on his forehead, the way he carried hi[m]self, his accent, his clothing choice, just the way he was being[.]" Mr. Raines agreed, though, that Defendant identified himself to him. Mr. Raines stated that he had no doubt that Defendant robbed him.

Candy Raines, Mr. Raines's mother, testified that she had known Defendant for about fifteen years. Ms. Raines stated that, in August 2019, she was the general manager of Motel 6. Ms. Raines had previously worked with Defendant's mother,[3] who was the head housekeeper, as well as Ms. Dunford and, briefly, Defendant. In August 2019, Ms. Dunford worked in laundry. Ms. Raines stated that Defendant spent most of the day at Motel 6 when Ms. Dunford was working and that he argued with her, followed her around, and sat and talked. Ms. Raines said that Defendant typically wore blue jeans "with designs," work boots, and t-shirts.

Ms. Raines testified that, on the night of the robbery, Mr. Raines called her crying and "hysterical . . . [, y]elling he just got robbed" at gunpoint. Ms. Raines stated that, when she arrived at Motel 6, Mr. Raines was "crying, balled up, sitting in a chair" and waiting to speak to the police. Ms. Raines provided the surveillance camera recordings to the police. She stated that between $5,000 and $7,000 was missing after the robbery and that Motel 6 did not give Defendant permission to take that money. Ms. Raines testified that, the day after the robbery, Ms. Dunford called and stated that she would not be returning to work.

The State played the surveillance recordings for Ms. Raines. She testified that, although she did not immediately recognize Defendant in the first recording, "it [did] look like him." She stated that she first identified Defendant in the recording when he raised his middle finger at the camera. Ms. Raines noted that Defendant "had hatred out for the owner." Ms. Raines denied discussing Defendant's identity as the robber with Mr. Raines at the scene; she noted that he was "too upset" and that she sent him home.

On cross-examination, Ms. Raines testified that she had worked for Motel 6 for nine years and had worked at the same motel when it was a LaQuinta Inn. She denied that Defendant's mother was ever her supervisor. Ms. Raines stated that Mr. Raines did not identify Defendant to her on the day of the robbery. When asked whether "a lot of drug activity" occurred at Motel 6, Ms. Raines responded, "I can't slander Motel 6" and said that she did not know.

---

[3] Because Jenny Dunford and Defendant's mother share a surname and Defendant's mother did not testify at trial, for clarity, we will refer to Defendant's mother only by her relationship to Defendant. We intend no disrespect in doing so.

Ms. Raines testified that she was not present for the robbery and did not personally see who robbed Mr. Raines. She stated that Mr. Raines had applied for his position at "the front desk, like everyone else." Ms. Raines denied that she spent time with Defendant and his wife at the motel pool.

Knoxville Police Department Investigator Tony DeLala testified that he was assigned to the Motel 6 robbery investigation and that he spoke to Ms. Raines and took her statement. Investigator DeLala stated that the police were unable to locate Defendant during the first day of the investigation. Investigator DeLala identified the photographs of the tan Honda Odessey van and stated that it was registered to Defendant. Investigator DeLala stated that a portion of the surveillance recording showed Defendant's uncovered hand holding the lobby door. He said fingerprint testing on the door was inconclusive. Investigator DeLala testified that Defendant was arrested about six days after the robbery.

On cross-examination, Investigator DeLala testified that, on the morning after the robbery, he attempted unsuccessfully to call Mr. Raines. Investigator DeLala stated that he did not initially listen to the 911 call recording. He said that Defendant called another officer on August 14 and arranged to turn himself in. Investigator DeLala stated that the crime scene investigators did not collect any usable fingerprints from Defendant's van.

Knox County Sheriff's Department Captain Aaron Turner testified that he was the records custodian at the Knox County jail and that Defendant made several recorded telephone calls at the jail using his inmate identification number. Recordings of four August 14, 2019 calls were received as an exhibit.

In the first recording, Defendant spoke to a woman who later identified herself as Ms. Dunford. She and Defendant discussed their children, posting bond, and adding money to his account. In relevant part, Defendant stated that he was glad "they" had come that day because he was "tired of running."

In the second recording, Defendant and Ms. Dunford discussed the process of adding money to Defendant's account. Defendant recalled an interaction in which someone told him to come out with his hands up, but he told the person to let him put on his shoes. Defendant mentioned turning himself in, although this portion of the recording was unintelligible. Ms. Dunford denied sending "them" to Defendant; she stated that Defendant was gone before she got there and that she and Defendant were "supposed to do this together today." Defendant stated that Ms. Dunford had not done "what [she was] supposed to do" on his birthday and that this meant that she was "doing it for someone else," which she denied. When Ms. Dunford asked why he seemed to be in a better mood, Defendant responded, "F--k being on the run, man, that s--t ain't straight, man." He later stated, "It ain't the same being on the run."

-6-

In the third recording, Defendant and Ms. Dunford discussed that he would be required to wear an ankle monitor once he posted bond. Defendant stated that he would be willing to serve sixteen years on probation. Defendant and Ms. Dunford also discussed child support payments. Defendant expressed doubt that Ms. Dunford loved him. Ms. Dunford stated that she went nowhere and that she would allow Defendant to track her location if he wished. Defendant asked Ms. Dunford several times not to cheat on him. Ms. Dunford responded that she had not cheated on him and would not do so. In the fourth recording, Defendant stated that he had been "on the run" for five days and that it felt like "forever."

After the State rested, Defendant chose not to testify. Ms. Dunford testified for the defense that she and Defendant married in 2018 and that they had been in a romantic relationship for twenty-two years. She stated that Defendant's mother, who was a housekeeping supervisor at what was then the LaQuinta Inn, offered her a job in 2005. Ms. Dunford stated that Defendant's mother was also Ms. Raines's supervisor. Ms. Dunford left in 2007 after having a baby and returned about two years later, at which time Ms. Raines no longer worked there. Ms. Dunford knew Mr. Raines through work and because he attended parties at Defendant's mother's house.

Ms. Dunford testified that she drove the Honda Odessey van to work and that, in August 2019, she reported to work at 9:00 a.m. and worked in whichever capacity she was needed until the tasks were finished. Ms. Dunford stated that she shared four children with Defendant and that he had three children from previous relationships. She said that, in one of the jail telephone calls, she discussed with Defendant that he had an arrest warrant related to child support payments.

On cross-examination, Ms. Dunford agreed that Defendant could be "somewhat of a jealous husband[.]" However, she then denied that he was jealous or that he accused her of cheating on him. She did not know if Defendant accused her of cheating in one of the jail telephone calls. Ms. Dunford denied that Defendant stayed at Motel 6 all day while she worked. She stated that Ms. Raines would allow Defendant to sleep at the motel after he had worked the night shift until Ms. Dunford finished her shift so that they could drive home together. Ms. Dunford stated that Ms. Raines also allowed Defendant to bring the children to the motel pool on occasion.

Ms. Dunford did not know the date of Defendant's child support warrant. She also did not know whether Defendant sent her text messages on the morning of August 9, 2019, stating that he was sorry, that he loved her, and that he hoped she would forgive her. Ms. Dunford noted that she and Defendant exchanged many text messages.

Ms. Dunford testified that, on the morning of the robbery, she was awakened by the police inside her home.  When asked whether she told the police that she did not know Defendant's location, Ms. Dunford responded, "He was at his friend's.  I don't know."  She agreed that their van was not at home at that time.  Ms. Dunford said that she quit her job the following day "because [she] was advised to."

On redirect examination, Ms. Dunford denied that Defendant ever accused her of sleeping with Motel 6's owner or that Defendant ever "pursue[d]" him.  She stated that she trusted Defendant.

Upon this evidence, the jury convicted Defendant as charged.  At the sentencing hearing, the State provided certified copies of Defendant's previous convictions for attempted especially aggravated robbery and robbery; the State noted that, although the offenses occurred in the same twenty-four-hour period, they involved separate victims and were violent felonies.  The State asserted that Defendant was a Range II multiple offender; the applicable sentencing range for a Class B felony was twelve to twenty years.  The State noted that Defendant's convictions in this case should merge to reflect one conviction each for aggravated robbery and aggravated kidnapping.  The State noted that it was requesting an eighteen-year sentence but was not requesting consecutive sentencing.

The presentence report reflected that Defendant was thirty-six years old and that, although he denied any gang affiliation, he was a "confirmed active member" of the Gangster Disciples.  Relative to the offenses in this case, Defendant submitted the following statement: "I feel bad for the victims and everybody that this matter has affected."

According to the presentence report, Defendant had prior criminal convictions for operating a vehicle without registration or a registration plate in 2017; casual exchange in 2008; failing to carry or produce a license in 2007; criminal impersonation, attempted especially aggravated robbery, and robbery in 2006; and contributing to the delinquency of a minor and failing to stop at the scene of an accident in 2005.  Defendant was also adjudicated delinquent in juvenile court for the following offenses: assault, two counts of theft of property valued at more than $1,000 but less than $10,000, two counts of auto burglary, and two counts of aggravated burglary in 2004; resisting a stop, frisk, halt, arrest, or search involving a weapon, evading arrest, and failing to stop at the scene of an accident in 2003; casual exchange and resisting a stop, frisk, halt, arrest or search involving a weapon in 2002; two violations of probation in 2001; vandalism up to $500 in 2000; and vandalism[4] up to $500, violation of probation, and disorderly conduct in 1999.  The report

---

[4] The presentence report reflects that Defendant received diversion for this offense.

noted a 1998 "burglary-other than habitation" charge for which no disposition was found; Defendant was eleven years old at that time.

The presentence report reflected that Defendant began serving a sentence in the Tennessee Department of Correction ("TDOC") in 2010 and was granted parole on May 29, 2013. A violation warrant was filed on July 18, 2013, because Defendant accumulated new criminal charges. Defendant's parole was revoked on January 17, 2014, and his sentence expired on May 15, 2014. Defendant had three TDOC infractions in 2011; two for violating "TDOC/Inst. Policy" and one for a positive drug test. Defendant had one Knox County jail disciplinary infraction for gambling in 2009.

Defendant dropped out of high school in the tenth grade. Defendant stated that he drank alcohol occasionally between age thirteen and 2017, and he reported smoking marijuana once or twice weekly between age thirteen and 2007. He stated that his father was not involved in his life. Defendant reported having seven children, ranging in age from twenty-one to twelve. His work history consisted of working for "Michael Dunford Subcontracting" between 2014 and 2022. The report noted, "Defendant is not eligible for probation; therefore, a Strong-R assessment was not completed."[5] When asked by the trial court if he wished to address the court, Defendant stated, "Hey, I apologize for everything and, man, I got a wife and kids, and I'm sorry."

The trial court stated that it had considered the purposes and principles of the Sentencing Act, the presentence report, the nature and characteristics of the criminal conduct, and Defendant's allocution. The trial court noted Defendant's having a wife and children and applied mitigating factor (7), that Defendant's conduct "was motivated by a desire to provide necessities for his family[.]" *See* Tenn. Code Ann. § 40-35-113(7). The court noted, "That is not to excuse [Defendant's] conduct in any way whatsoever, but I think the proof does at least raise the application of that factor to some extent."

The trial court applied enhancement factor (1), that Defendant had a previous history of criminal convictions in addition to those necessary to establish his range; the court noted that Defendant also had a disciplinary history while incarcerated. *See* Tenn. Code Ann. §

---

[5] We note that the presentence report officer in this case did not prepare a Strong-R assessment because Defendant was not eligible for alternative sentencing. Tennessee Code Annotated section 40-35-210(b)(8) provides that to "determine the specific sentence and the appropriate combination of sentencing alternatives . . . the court shall consider . . . . [t]he result of the validated risk and needs assessment conducted by the department and contained in the presentence report." We wish to emphasize that preparation of a validated risk and needs assessment is a mandatory component of a presentence report. *See* Tenn. Code Ann. § 40-35-207(a)(10) ("The presentence report shall set forth . . . [t]he results of the validated risk and needs assessment"); *State v. Pace*, No. W2022-01092-CCA-R3-CD, 2023 WL 6626457, at *2 (Tenn. Crim. App. Sept. 1, 2023), *perm. app. denied* (Tenn. Apr. 11, 2024).

40-35-114(1). The court found that factor (1) "applies to some extent in this case, but certainly not to the extent that we would see in other cases."

The trial court found that Defendant was a Range II multiple offender. The court merged the two aggravated robbery convictions and ordered a fifteen-year sentence to be served at 85% service, as mandated by statute. The court also merged the aggravated kidnapping convictions and ordered a fifteen-year sentence to be served at 100% service, also as mandated by statute. The court ordered that the sentences be served concurrently.

Thereafter, trial counsel filed a motion for new trial thirty-one days after the sentence was entered, and the trial court dismissed the motion as untimely. Defendant filed a pro se notice of appeal, which the trial court treated as a petition for post-conviction relief. After subsequent counsel was appointed and a hearing was held, the trial court granted post-conviction relief limited to the untimely filed motion for new trial. Subsequent counsel was permitted to file a motion for new trial, which was denied. Defendant timely appealed.

## Analysis

As a preliminary matter, out of what appears to be an abundance of caution, Defendant has included in his appellate brief a separate discussion of whether this court should exercise plenary or plain error review of his issues in light of the untimely motion for new trial and subsequent order granting post-conviction relief. We agree with the State and Defendant that plenary review is the proper standard here—he was granted post-conviction relief in the form of a delayed motion for new trial and, by extension, appeal. We note, though, that even if no motion for new trial had been filed, this court would still extend plenary review to sufficiency of the evidence and sentencing. *See State v. Stafford*, No. W2024-00637-CCA-R3-CD, 2025 WL 399856, at *6 (Tenn. Crim. App. Feb. 4, 2025) (citing Tenn. R. App. P. 3(e); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989); *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984)).

### I. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his convictions, arguing that Mr. Raines identified the perpetrator to the 911 operator multiple times as a black male and that Mr. Raines and Ms. Raines did not identify Defendant to anyone while at the scene. The State responds that the evidence is sufficient.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). As charged in this case, aggravated robbery is defined as a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1).

As pertinent here, aggravated kidnapping is false imprisonment committed "to facilitate the commission of any felony or flight thereafter[.]" Tenn. Code Ann. § 39-13-304(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). "'Unlawful' means, with respect to removal or confinement, one that is accomplished by force, threat or fraud[.]" Tenn. Code Ann. § 39-13-301(15). "'Coercion' means [c]ausing or threatening to cause bodily harm to any person, physically restraining or confining any person[,] or threatening to physically restrain or confine any person." Tenn. Code Ann. § 39-13-301(3)(A).

Defendant only raises the sufficiency of the evidence relative to his identity as the person who robbed and kidnapped Mr. Raines, not the State's proof of the remaining elements of aggravated robbery or aggravated kidnapping. We will confine our analysis accordingly.

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2022). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences

-11-

to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In the light most favorable to the State, Mr. Raines identified Defendant at trial as the perpetrator and testified that Defendant stated, "It's me, Michael . . . . Michael Dunford" during the robbery. Mr. Raines stated that he was certain of Defendant's identity as the person who robbed him, and he provided the perpetrator's license plate number, which was later found to be registered to Defendant. He also explained that Defendant gestured at the surveillance camera with his middle finger because he was angry at Motel 6's owner over the owner's alleged affair with Ms. Dunford. Mr. Raines testified that he told the 911 operator that the perpetrator was black because Defendant was wearing paint or dirt on his face. Mr. Raines also told the 911 operator that he assumed the perpetrator was black from his manner of speaking. The inconsistencies in Mr. Raines's identification of Defendant as the perpetrator were resolved by the jury when it rendered its guilty verdict, and we will not disturb its findings on appeal.

We note that, aside from Mr. Raines's statements, the State provided additional proof of Defendant's identity. The surveillance recordings reflected that the perpetrator's forehead and hands were clearly white. Ms. Raines also identified Defendant based upon the recording showing his gesturing at the camera. Moreover, Defendant's jail telephone calls reflected that he referred to being "on the run" multiple times, including saying that he had been on the run for five days; the calls were made on August 14, 2019, five days after the robbery. The trial court instructed the jury that Defendant's flight could support an inference of guilt. The evidence of Defendant's identity was sufficient, and he is not entitled to relief on this basis.

## *II. Sentencing*

Defendant contends that the trial court abused its discretion by not imposing a minimum in-range sentence of twelve years for each of his convictions. Defendant argues that "because there was only one enhancement factor weighed against one mitigating factor, a concurrent sentence of twelve years would have been appropriate." The State responds that the trial court did not abuse its discretion.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the

minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e); *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Although the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 698 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles" set out in Tennessee Code Annotated sections 40-35-102 and 103. *Carter*, 254 S.W.3d at 346.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In this case, the trial court detailed its findings and placed its reasons for the sentences imposed on the record. The record establishes that the trial court properly considered the purposes and principles of sentencing. The trial court's decision to impose within-range sentences is presumptively reasonable. *Bise*, 380 S.W.3d at 707.

Defendant has failed to show the within-range sentences were improper. Enhancement and mitigating factors are advisory only; although Defendant does not explicitly argue that the trial court misapplied either factor it considered, we note that the

-13-

misapplication of an enhancement or mitigating factor is no longer a basis to reverse a sentence. *See id.* at 706. Defendant's argument for a twelve-year sentence amounts to disagreement with how the trial court weighed the evidence in the record, which does not constitute an abuse of discretion. Our review of the record, particularly the presentence report containing Defendant's lengthy criminal history, reflects that the trial court exercised restraint in imposing concurrent, below mid-range sentences in this case. Defendant is not entitled to relief on this basis.

## Conclusion

Based on the foregoing and the record as a whole, the judgments of the criminal court are affirmed.


_s/ Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE